UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL  TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:15-cv-00539-SEB-DML |
| | ) | |
| NICE-PAK PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 31], filed on October 17, 2016.[1]  Plaintiff Paul Turner has brought this action against his former employer, Defendant Nice-Pak Products, Inc. ("Nice-Pak"), alleging that Nice-Pak discriminated against him in the workplace and ultimately terminated him because of his race (African-American) and then retaliated against him, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").[2]  For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

**Factual Background**

---

[1] Defendant originally filed its motion for summary judgment on March 24, 2016 [Dkt. No. 25]. However, on September 16, 2016, the Court stayed that motion pending the filing of a revised motion and accompanying briefing responsive to the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).  We have before us now that revised motion.

[2] Although Mr. Turner's complaint references a hostile work environment, his response brief makes clear that he is not bringing a separate hostile work environment claim against Nice-Pak but rather simply claims that the hostile behavior he alleges he endured may be evidence to support his disparate treatment claims.

**General Background**

Nice-Pak is a global manufacturer of wet-wipe products.  Nice-Pak has two production facilities in Indiana, one located in Mooresville and the other in Plainfield.  Mr. Turner began his employment with Nice-Pak on November 11, 2013, when he was hired on at Nice-Pak's Mooresville facility as an Operator in Training.  Mr. Trainer was assigned to "D shift," which works alternating 12-hour shifts from 6 p.m. to 6 a.m.  According to Nice-Pak, Mr. Turner's immediate supervisor was Production Supervisor Sharon Rodebaugh.  Mr. Turner, however, maintains that when he was hired he initially reported to a man named Barry Ferguson and that after Mr. Ferguson left Nice-Pak approximately two weeks later, Mr. Turner was never assigned a new supervisor, although he acknowledges that Ms. Rodebaugh "seemed to be filling in for [Mr. Ferguson] in some respects…."  Turner Decl. ¶ 7.  In any event, it is undisputed that Ms. Rodebaugh signed Mr. Turner's performance evaluation and written discipline.  Rodebaugh Decl. ¶¶ 4, 18.

As an Operator in Training, Mr. Turner was trained to become a Machine Operator, which involved his learning to operate the Integra machine on production line 44, which manufactures the packaging products for the wet wipes.  Each Operator in Training is assigned a certified Machine Operator who oversees the new employee's training.  Mendy Plaskett, who was certified on the Integra machine, was assigned to train Mr. Turner.  Prior to being assigned as Mr. Turner's trainer, between March and May 2013, Ms. Plaskett trained another Nice-Pak employee, Brittany Hoosier, who is white, on the Ilapak machine.

2

**The Probationary Period of Employment**

Pursuant to the Employment Practices section of Nice-Pak's Employee Handbook ("the Handbook"), all new hires undergo a three-month introductory or probationary period of employment. This introductory or probationary period is intended to provide new hires with an opportunity to learn about the Company and their job responsibilities. It also allows the employer's supervisor to evaluate the employee's skills, work habits, and performance to determine if the employee should continue to be employed by Nice-Pak beyond the probationary period. The "New Hire Orientation" section of the Handbook outlines specific expectations for its employees during the introductory period, which include as follows:

> During the first three (3) months of employment, Associates should have no safety infractions, disciplinary issues, and less than three (3) attendance points. If an employee has any performance issues during the introductory employment period, the probationary period will be extended to 120 days. Repeated performance issues, during the probationary period, will result in termination.

Exh. 3 to Fox Decl.

According to Mr. Turner, although the introductory period is intended to allow the new hires to learn about the Company and their job responsibilities, Ms. Plaskett did not properly train him in these respects. Specifically, Mr. Turner alleges that, although the trainers are supposed to be with their trainees at all times, Ms. Plaskett was often absent and that Ms. Plaskett failed to train him on the most difficult aspect of the Machine Operator position, which is called the "changeover." Turner Dep. at 34-36, 63.

According to Mr. Turner, Ms. Plaskett would simply perform the changeover herself, so he never learned how to properly perform this duty.

Mr. Turner testified that he went through orientation with five or six other individuals, two of whom were African-American. One of the African-American trainees was assigned an African-American supervisor. Although Mr. Turner does not have personal knowledge regarding what training the other trainees received or who each of their trainers were, he believes, based on conversations he had with other employees, that he was the only new hire assigned to an "inexperienced" trainer. Turner Dep. at 42-43.

**Plaintiff's Initial Issues with His Trainer**

Not long after Mr. Turner's introductory period of employment began with Nice-Pak, issues arose between him and Ms. Plaskett. On December 13, 2013, Mr. Ferguson, his supervisor at the time, emailed his supervisor Marc Hull, Human Resources ("HR") Generalist Stacy Stelter, and Richard Kruger from the HR Department, outlining various incidents that reportedly had occurred between Mr. Turner and Ms. Plaskett. In this email, Mr. Ferguson recounted that on Mr. Turner's third day of work, November 20, 2013, there was a "conflict" between Mr. Turner and Ms. Plaskett that extended into the weekend on November 23, 2013, when the two "had words between each other." Dkt. 33-5. Mr. Ferguson further reported that the next day, on November 24, 2013, Mr. Turner and Ms. Plaskett were arguing with each other about who was responsible for taking out the trash. *Id.* From December 6 through December 8, 2013, "it was a constant struggle between [Mr. Ferguson] and [Ms. Plaskett]." *Id.*

Mr. Ferguson held individual conferences with Mr. Turner and Ms. Plaskett in which he addressed these issues with each.  He spoke with Ms. Plaskett about the expectations of her as a trainer and informed her that she had completed a training check-off document incorrectly by signing off on it all at once.  In his notes, Mr. Ferguson wrote that Ms. Plaskett "needs to be more prepared to train."  *Id.*  Mr. Ferguson also noted that Mr. Turner "needs to stop and listen more.  To not argue, and to accept that he is the person being trained and not the trainer."  *Id.*  In his December 13, 2013 email, Mr. Ferguson noted that on December 11, 2013, following his conferences with Ms. Plaskett and Mr. Turner, "the bickering and argumentative nature continued between the two."  *Id.*  On December 12, 2013, Mr. Ferguson completed a 30-day audit on Mr. Turner, noting that Mr. Turner "has a couple items in which to work on [sic]."  *Id.*

**Plaintiff's Complaints to Management**

On December 9, 2013, Mr. Turner complained to Mr. Kruger in Nice-Pak's Human Resources Department that he was not being properly trained by Ms. Plaskett.  Mr. Turner requested a different trainer because his work environment was "chaotic," "hostile," and "bullying."  Turner Dep. at 29-30.  Mr. Turner has testified that he discussed these issues with Mr. Kruger on more than one occasion and also spoke with other unnamed individuals in the HR Department, reporting that Ms. Plaskett was not as experienced as other trainers and that he wanted a new trainer.  Mr. Turner stated that other trainees, including "Brandy," who is white, were receiving proper training from

Chiann Bloom.  Mr. Turner explained that his situation was akin to "a kid preparing for a driver's license test [training] under someone who just got their license."  Pl.'s Resp. at 2.

Mr. Turner testified that Ms. Plaskett tried to "embarrass" him on various occasions, and would point out things he did wrong in a "bold" and "big" manner. Turner Dep. at 31-32.  Mr. Turner further testified that Thomas Taylor, Value Stream Coordinator, would blame him for things that went wrong and on one occasion "pinpointed" his bathroom breaks.  *Id.* at 53.  According to Mr. Turner, Mr. Taylor would approach him in a "hostile nature" to complain about things, such as issues with paperwork, when he was supposed to address such issues with Ms. Plaskett.  Mr. Taylor's hostile behavior towards Mr. Turner included being "irritated" and "angry" and raising his voice.  *Id.* at 54-55.

**Plaintiff's Performance Issues**

On December 21, 2013, Ms. Rodebaugh sent an email to Ms. Stelter with Nice-Pak's HR Department, addressing several issues Rodebaugh was having with Mr. Turner's work performance.  In that email, Ms. Rodebaugh detailed an argument Mr. Turner had with a co-worker, Chiann Bloom, regarding whether he should be required to try to fix one of the machines.  Mr. Turner did not believe he should attempt to do so because he was not certified, but Ms. Bloom told him that because he was in training and needed to learn, he should attempt to fix the machine and she would be there if he had questions.  According to Ms. Bloom, even after Ms. Plaskett returned to the line and fixed the machine, Mr. Turner continued to argue with her (Ms. Bloom) and followed her

6

into the break room after she told him to leave her alone.  Ms. Bloom wrote a statement following the incident and indicated that she wanted to file a complaint against Mr. Turner.  Mr. Turner denies that he harassed Ms. Bloom and followed her out of the area or to the break room.

Ms. Rodebaugh recounted in her email to Ms. Stelter that when she brought Mr. Turner into her office to discuss the situation, Mr. Turner began to complain about Ms. Plaskett and his belief that he was not being adequately trained.  At that meeting, Ms. Rodebaugh informed Mr. Turner that he would receive more training and would start to do the changeovers with Ms. Plaskett.  Exh. 1 to Rodebaugh Decl.

Ms. Rodebaugh also recounted in her email to Ms. Stelter that Mr. Turner did not seem to be absorbing the training he was receiving.  For example, she explained, when she and Ms. Plaskett tried to train Mr. Turner on the changeover process, he had to be told three times to use the estop button, which is a safety feature of the machine.  Ms. Rodebaugh also reported that Mr. Turner requested to leave for lunch four times while they were attempting to perform the changeover, even after Ms. Rodebaugh had told him that he needed to stay and learn the procedure.  Ms. Rodebaugh observed that Mr. Turner refused to complete the changeover paperwork unless Ms. Plaskett told him exactly what needed to be written down.  That same night, Ms. Rodebaugh asked Mr. Turner to complete test paperwork, explaining to him the importance of the paperwork and the proper way to complete it.  Despite these instructions, Mr. Turner competed the test paperwork incorrectly and then blamed his prior inadequate training for his mistakes.  *Id.*

7

According to Mr. Turner, he believed that Ms. Plaskett was responsible for completing the paperwork.

Two days later, on December 23, 2013, Ms. Rodebaugh sent two emails to Marc Hull (her supervisor at the time) and Ms. Stelter regarding Mr. Turner's performance and behavioral issues.  In the first email, sent at 6:03 a.m., Ms. Rodebaugh reported that Mr. Turner had been rude and insubordinate while she was on a production telephone call. Specifically, Ms. Rodebaugh recounted that she had previously requested of Mr. Taylor that he collect statements from Mr. Turner and all those involved with the incident between Turner and Ms. Bloom.  After completing his statement, Mr. Turner entered Ms. Rodebaugh's office, and, while she was on the call, asked her why he had to write the statement.  According to Ms. Rodebaugh, she told him that she would be with him shortly, but he returned thereafter on two separate occasions while she was still on the call, requiring her to tell him three separate times that she could not discuss the matter at that time because she was on the phone and that he needed to report back to the production line.  Ms. Rodebaugh subsequently talked with Mr. Turner and informed him that she would be giving the referenced statements to Human Resources.  Mr. Turner then supplemented his statement for Human Resources to complain that Ms. Rodebaugh had not interrupted her conference call to answer his question and that he did not believe he should have been made to wait.  Exh. 2 to Rodebaugh Decl.  Mr. Turner denies acting insubordinately when he attempted to inquire of Ms. Rodebaugh while she was on the conference call.

In her second email, sent at 6:25 a.m., Ms. Rodebaugh detailed two additional issues she had experienced with Mr. Turner during that shift.  According to Ms. Rodebaugh, Mr. Taylor reported that he had noticed that none of the information for the metal detection machine verification paperwork had been completed since 18:00 (6:00 p.m.), so he instructed Mr. Turner to fill in the missing information as "N/A."  Exh. 3 to Rodebaugh Decl.  Mr. Taylor's instruction reflected the fact that backdating information on the paperwork is not permitted by the company and is considered falsification.  Accordingly, during orientation, Nice-Pak employees are specifically told that backdating such paperwork is prohibited.  Exh. 5 to Rodebaugh Decl.  Despite these instructions, Mr. Turner completed the paperwork as if the checks had been timely completed and initialed his entries, thereby falsifying the documentation.  Exh. 4 to Rodebaugh Decl.  In her email, Ms. Rodebaugh also reported that Mr. Turner had taken a one hour lunch break even though employees are allowed only a half an hour for lunch, and that, when he returned from his lunch break, he reported to the wrong production line.  Exh. 3 to Rodebaugh Decl.

Approximately two weeks later, on January 7, 2014, Mr. Hull emailed Ms. Stelter to provide an "update" on Mr. Turner.  In that email, Mr. Hull stated that Mr. Turner was "being disruptive again" and that this had become his "normal routine."  Exh. 4 to Fox Decl.  Mr. Hull reported that Ms. Rodebaugh had removed Mr. Turner from training with Ms. Plaskett because Mr. Turner was causing Ms. Plaskett stress.  Mr. Hull stated that

Ms. Rodebaugh had moved Mr. Turner to another line to load lids and that there were no "further issues from him after the move."  *Id.*

Later that same day, Mr. Taylor sent an email to Mr. Hull stating that he believed Mr. Turner was "trying everything in [his] power to undermine his training."  Exh. 5 to Fox Decl.  Mr. Taylor wrote that Mr. Turner's "attitude and sarcasm" were bringing his team down and that Mr. Turner had Ms. Plaskett "in tears" and no longer wanted to train him.  *Id.*  Mr. Taylor complained that he had instructed Mr. Turner on three occasions on the procedures required to complete paperwork, but that Mr. Turner "still needs someone to hold his hand."  *Id.*  Mr. Taylor further noted that he had witnessed Mr. Turner walk away from Ms. Plaskett when she was attempting to explain things to him "a lot of times" and that Mr. Turner had "no sense of urgency" on the line.  *Id.*

Mr. Taylor attached notes to his email which described additional performance issues, including Mr. Turner's failure on January 3, 2014 to wear a beard net while he was on the floor, which is a violation of Nice-Pak's safety policy requiring that protective gear be worn at all times in the production area.  Mr. Taylor also noted that Mr. Turner exceeded the time of his allotted breaks multiple times during his shift that same day. Hourly production employees are given three fifteen-minute breaks and one 30-minute lunch break, but, according to Mr. Taylor's notes, Mr. Turner was tardy returning to work after almost all of his breaks on January 3, 2014.  *Id.*  Mr. Taylor does not deny having taken extended breaks, but maintains that a number of other employees took similar

breaks without consequence and that he was the only one who was closely monitored in this regard.

On January 9, 2014, Ms. Rodebaugh issued Mr. Turner a final written warning based on his attendance after he had been absent on December 20, 2013 and January 8, 2014, which resulted in his having accumulated two attendance points.  Under Nice-Pak's policy, employees are permitted to accumulate no more than three attendance points during the introductory period of employment.  Exh. 6 to Fox Decl.  Mr. Turner denies that he violated the attendance policy.

Ms. Rodebaugh emailed Mr. Hull on January 14, 2014 to inform him of two issues which had involved Mr. Turner during their shift that day.  First, Ms. Rodebaugh reported that Mr. Turner had gone on break without permission, which caused the Ilapak line to shut down because the Ilapak operator was unable to complete the Ilapak process without Mr. Turner being present.  Ms. Rodebaugh was required to step in and perform Mr. Turner's duties in order for the line to resume running.  According to Ms. Rodebaugh, when Mr. Turner returned from his break, she told him that it was unacceptable for him to walk off the line without permission, prompting him to argue with Ms. Rodebaugh, rather than accept the correction.  Ms. Rodebaugh told Mr. Turner that it could be considered job abandonment if he walked off the line again without permission; he continued to argue with her until she left the area.  Exh. 6 to Rodebaugh Decl.

Ms. Rodebaugh reported in her email that approximately thirty minutes later, Mr. Turner got into an argument with Sarah Svanes, an employee on the Ilapak line, after Ms.

11

Svanes became irritated with Mr. Turner for leaving boxes on the floor that were in her way.[3]  According to Mr. Turner, he had told Ms. Svanes that there was plenty of room to get around the boxes and then apologized, explaining that he could not leave his machine to move them.  Turner Aff. ¶ 15.  Following this dispute, Ms. Rodebaugh collected employee statements from four employees who had witnessed it, including Ms. Svanes, who all reported that Mr. Turner spoke in a "very rude way," called Ms. Svanes "stupid" and told her to "shut up," as he started walking toward her aggressively.  Exh. 7 to Rodebaugh Decl.  Mr. Turner denies having called Ms. Svanes stupid or acting in an aggressive manner toward her.

Mr. Turner maintains that the only time he can remember leaving the production line was one time in January when Ms. Plaskett had instructed him to try to perform the changeover on the Integra machine.  While doing so, Mr. Turner cut his finger and it was bleeding.  Mr. Turner told Ms. Plaskett about his injury and that he needed to go home.  According to Mr. Turner, he does not remember any other occasion when he left the line.

**Plaintiff's Termination**

Also on January 14, 2014, Ms. Rodebaugh completed a performance evaluation of Mr. Turner, giving him an "unsatisfactory" or "needs improvement" rating in every category, including safety, ability, interpersonal skills, dependability, and approach to work.  Exh. 8 to Rodebaugh Decl.  On January 15, 2014, Ms. Rodebaugh, Mr. Hull, and

---

[3] Mr. Turner had at that point been moved from the Integra line (line 44) to the Ilapak line (line 11).

Mr. Kruger collectively decided to terminate Mr. Turner's employment before the end of the introductory period based on his failure to meet Nice-Pak's performance expectations in various areas, including his poor attendance, failure to learn his job duties, failure to follow safety procedures, insubordination, and inability to get along with his co-workers and managers.

From 2012 through 2014, Nice-Pak terminated a total of forty-eight (48) employees for failing to meet expectations during the introductory period of their employment. Of those forty-eight employees, thirty-eight (38) were white, seven (7) were African-American, two (2) were Hispanic, and one (1) was listed as "Not Specified." Exh. B to Fox Decl. ¶ 12.

**The Instant Litigation**

On April 6, 2015, Mr. Turner filed his Complaint in this action after receiving his notice of right to sue from the Equal Employment Opportunity Commission ("EEOC"). As noted above, Nice-Pak filed its original summary judgment motion on March 24, 2016 and its substituted motion on October 17, 2016. The substituted motion is now fully briefed and ripe for ruling.

<u>Legal Analysis</u>

**I.     Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of*

14

*Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

Mr. Turner's claims of racial discrimination (for failure to train and discriminatory termination) and retaliation under Title VII invoke the Seventh Circuit's recent decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).  Until fairly recently, a plaintiff had two options for proving a claim of discrimination: he could proceed under the "direct" method of proof or the "indirect" method of proof.

Under the direct method, a plaintiff was required to adduce either direct or circumstantial evidence that his employer had a discriminatory motivation. *Collins v. Am. Red. Cross,* 715 F.3d 994, 999 (7th Cir. 2013). Direct evidence is evidence that "should 'prove the particular fact in question without reliance upon inference or presumption.'" *Lim v. Trustees of Ind. Univ.*, 297 F.3d 575, 580 (7th Cir. 2002) (quoting *Markel v. Bd. of Regents of the Univ. of Wisc.*, 276 F.3d 906, 910 (7th Cir. 2002)) (emphasis removed). Stated otherwise, direct evidence is essentially an "admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Of course, if the plaintiff was able to provide direct evidence of discrimination in the workplace, he need not proceed any further, for this evidence alone would prove his claim.

But given that such "smoking-gun" evidence is exceedingly rare, a plaintiff proceeding under the direct method could instead point to circumstantial evidence that, when viewed on whole, established that he had been discriminated against based on some proscribed factor. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) *overruled by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Classes of

16

circumstantial evidence include: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Id.* As the Seventh Circuit explained in *Troupe v. May Department Stores Co.*, each type of circumstantial evidence might be sufficient by itself depending on its strength in relation to the other evidence, or it could be used together to "compos[e] a convincing mosaic of discrimination against the plaintiff." 20 F.3d 734, 736–37 (7th Cir. 1994). This particular option became known as "the indirect (or 'mosiac') way of *directly* proving [discrimination]." *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) (Wood, J., concurring) (emphasis added).

Alternatively, a plaintiff can prove his claim of discrimination under the so-called indirect method of proof derived from the Supreme Court's analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the indirect method, the plaintiff carries "the initial burden under the statute of establishing a prima facie case of ... discrimination." *McDonnell Douglas,* 411 U.S. at 802. To establish a prima facie case of discrimination a plaintiff must offer evidence that: (1) he is a member of a protected class, (2) his job performance met the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) another similarly situated individual who was not

17

in the protected class was treated more favorably than the plaintiff. *Coleman*, 667 F.3d at 845 (citation omitted). Once a prima facie case is established, a presumption of discrimination is triggered. The burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *Id.* at 804.

Together, the direct method of proof, comprised of its own direct and indirect sub-methodologies, and the indirect burden-shifting method of proof derived from *McDonnell Douglas*, resulted in what has been described as a labyrinthine system for proving discrimination, one fraught with "snarls and knots," which eventually has proven to be "too complex, too rigid, and too far removed from the statutory question of discriminatory causation." *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 737 (7th Cir. 2013). Accordingly, a series of Seventh Circuit opinions followed, each signed onto by a majority of the Circuit's judges, which question the relative utility of this "ossified direct/indirect paradigm." *Id.* (collecting cases).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit eliminated the sub-methodologies and analytical divisions of evidence which had developed under the so-called direct method of proof to replace that "rat's nest surplus of 'tests'" with a single issue: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or

other adverse employment action." 834 F.3d at 765, 766. Under this new, "simplified"

approach, the "[e]vidence must be considered as a whole, rather than asking whether any

particular piece of evidence proves the case by itself—or whether just the 'direct'

evidence does so, or the 'indirect' evidence." *Id.*

The *Ortiz* court noted that its decision did "not concern *McDonnell Douglas* or

any other burden-shifting framework." *Id.* at 766.  However, in the short period of time

since that decision, the Seventh Circuit has stated that the straightforward inquiry in *Ortiz*

has, indeed, "replaced the notion of two distinct *methods of proof* – the 'direct' and

'indirect." *Harris v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*,—Fed.

Appx.—, 2016 WL 7228703, at *2 (7th Cir. Dec. 13, 2016) (emphasis added).  We

struggle to reconcile the Seventh Circuit's clear preference for a single, simplified

approach in analyzing claims of discrimination with the continued existence and

applicability of the Supreme Court's directives in *McDonnell Douglas*.  To do so, we

shall view *McDonnell Douglas* as simply one pattern – one of many – superimposed on

the evidence in an effort to enable a reasonable trier of fact to determine discrimination.

*See Knapp v. Evgeros, Inc.*,—F. Supp. 3d—, 2016 WL 4720026, at *6 (N.D. Ill. Sept. 9,

2016). However, a district court need not limit itself to analyzing the evidence only

according to the *McDonnell Douglas* template, nor should it be bound by the formulaic

foxtrot which has developed under that framework.

## II.    Discussion of Plaintiff's Claims

### A.    Racial Discrimination

### 1.    Failure to Train

Mr. Turner has first alleged that Nice-Pak discriminated against him by failing to provide him proper training.  The denial of job-related training can under certain circumstances constitute an adverse employment action under Title VII.  *Durkin v. City of Chi.*, 341 F.3d 606, 611 (7th Cir. 2003).  In order to succeed on such a claim, however, Mr. Turner must establish, *inter alia*, that he was denied training *because of his race*.  *See Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998).  Because Mr. Turner has failed to present any evidence to show that Nice-Pak denied him training under circumstances giving rise to an inference of discrimination, this claim fails.

Initially, we note that we find no evidence establishing that Mr. Turner in fact ever received inadequate training.  To the contrary, the evidence establishes that all Operators in Training are assigned a certified Machine Operator to oversee their training and it is undisputed that Nice-Pak assigned Mr. Turner a certified Machine Operator, Mendy Plaskett, as his trainer.  Mr. Turner nevertheless argues that Ms. Plaskett was inexperienced and failed to provide the same quality of training as other certified trainers.

Although it appears true that Ms. Plaskett had been a trainer for a relatively short period of time before Mr. Turner was hired, the undisputed evidence establishes that she had successfully trained another employee on the Ilapak machine before she was assigned to train Mr. Turner and that, on November 14, 2013, a few days after Mr. Turner was hired, she received her certification on the Integra machine.  Accordingly, at the time she trained Mr. Turner on the Integra machine, she had prior experience as a trainer and the

20

requisite certification on the Integra machine to train new hires. The fact that Ms. Plaskett was a relatively new trainer does not alone establish that her efforts amounted to a failure by Nice-Pak to adequately train Mr. Turner. Moreover, while Mr. Turner contends that Ms. Plaskett failed to properly train him on the changeover process and on occasion left him alone on the production line when she should have been supervising him, the evidence establishes that in addition to her efforts, he also received training from Mr. Taylor and Ms. Rodebaugh on the changeover process as well as the proper way to complete the required paperwork. Accordingly, even if the evidence established that Ms. Plaskett inadequately trained Mr. Turner, it is undisputed that he received additional training from Mr. Taylor and Ms. Rodebaugh on the duties for which he contends he had not been properly trained by Ms. Plaskett.

Whether Mr. Turner's training was in fact inadequate is not determinative in this case, however, because even if he could establish that he received inadequate training, there is no evidence from which a reasonable jury could infer that any lack of such training was the result of discrimination. There is no evidence that any Nice-Pak employee or supervisor including Ms. Plaskett ever used racially hostile terms or otherwise displayed racial animus toward him or other African-American employees. The only evidence put forth by Mr. Turner in support of this discrimination claim is his view that one white employee from his orientation group, "Brandy," was able to perform more skills than he, which he attributes to her having received proper training from

21

Chiann Bloom, a trainer whom Mr. Turner believes to have been more experienced than Ms. Plaskett.

Mr. Turner's view that one white employee was provided a more experienced trainer than he was assigned, coupled with his speculation that her ability to perform more skills was due to her superior training as opposed to some other factor, is plainly insufficient in terms of raising an inference of discrimination. This conclusion is buttressed by Mr. Turner's testimony that there were other African-American employees in his orientation group, though he was the only new hire who was given an inexperienced trainer. Rather than support an inference of discrimination, this fact supports the conclusion that, even if Mr. Turner did receive less thorough training than other new hires in his orientation group, it was due not to his race but to some non-protected factor, such as personal animus, which is not actionable under Title VII. *See Overly v. Keybank Nat'l Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011) (upholding district court's granting of summary judgment because the evidence suggested that personal animus, rather than gender discrimination was the motive behind the adverse action). Thus, viewing the evidence as a whole, as we are required to do under *Ortiz*, Mr. Turner has failed to adduce evidence to show that he was denied training because of his race.[4]

---

[4] Mr. Turner also argues that he had no supervisor assigned to him, thereby depriving him of a person to evaluate his skills, work habits, and performance. Mr. Turner, however, relies solely on his own testimony to establish that he was not assigned a supervisor, while the documentary evidence in the record supports Nice-Pak's assertion that Ms. Rodebaugh acted as Mr. Turner's supervisor. The record establishes that Ms. Rodebaugh wrote several emails about Mr. Turner's performance issues, completed his performance review, and signed the written warning he was issued regarding his attendance. Accordingly, Mr. Turner's personal belief that Ms. Rodebaugh

## 2.    Discriminatory Termination

Mr. Turner also alleges that he was terminated because of his race in violation of Title VII.  He structures his evidence in support of this claim within the *McDonnell Douglas* framework, arguing that Nice-Pak's proffered reason for his termination, to wit, various work performance issues, is pretext for discrimination because the company did not apply its legitimate job expectations uniformly and he was disciplined when similarly situated non-African American employees were treated more favorably.  However, even when viewed in the light most favorable to Mr. Turner, as we are required to do at this stage in the litigation, the evidence cited by him is wholly insufficient to raise the inference that he was terminated because of his race.  Nice-Pak is, therefore, entitled to summary judgment in its favor on this claim.

In support of this discriminatory termination claim, Mr. Turner argues that Nice-Pak's characterization of his performance issues, which according to the company led to his termination, is subjective and contrary to his own recollection of events.  This difference creates credibility issues that must be decided by a jury, he maintains.  According to Mr. Turner, many of the performance issues cited by Nice-Pak, including, *inter alia*, the company's belief that he was insubordinate toward Ms. Rodebaugh, left the production line without seeking permission, and was argumentative and difficult to get along with either did not happen or were mischaracterized.  While Mr. Turner does not

---

was not his supervisor is insufficient to create a triable issue of fact, given the abundance of documentary evidence to the contrary.

deny that he did violate certain company policies, such as taking extended breaks and violating safety procedures, he contends that nearly all employees, white and black, broke similar rules and yet were not terminated.

However, under well-established Seventh Circuit law, it is not within the court's purview to "'sit as a superpersonnel department' where disappointed … employees can have the merits of an employer's decision replayed to determine best business practices." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004)).  So long as evidence establishes that Nice-Pak genuinely believed that Mr. Turner had engaged in misconduct and failed to meet its legitimate performance expectations during the probationary period, it was entitled to terminate his employment on that basis.  There simply is no evidence in this record from which a reasonable jury could infer that race, rather than Nice-Pak's honest belief that Mr. Turner's behavior and performance did not meet their legitimate expectations, caused his discharge.  As discussed above in connection with Mr. Turner's failure to train claim, Mr. Turner has not alleged that any Nice-Pak employee or supervisor ever used racially hostile terms or otherwise displayed a racial animus toward him or other African-American employees.  Although he contends that "nearly every other employee" violated some of the same policies for which he was terminated, that includes employees of all races and therefore tends to show, at most, that Mr. Turner may have been singled out based on some non-protected characteristic.  It clearly does not raise an inference of race

discrimination.  For these reasons, Mr. Turner's claim for discriminatory termination fails.

### B.    Retaliation

Mr. Turner's retaliation claim cannot survive summary judgment because he has failed to establish a required element of a Title VII retaliation claim, to wit, that he engaged in statutorily protected activity.  *See, e.g.*, *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) ("A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two.") (citation omitted)).  In his deposition, Mr. Turner testified that he complained about not receiving adequate training and generally that his work environment was "chaotic," "hostile," and "bullying."  Turner Dep. at 26-29.  However, Mr. Turner has presented no evidence that he notified or otherwise indicated to Nice-Pak that the treatment of which he was complaining was related to his race or that he had otherwise mentioned discrimination or racial animus.

It is well-established under Seventh Circuit law that general complaints unconnected to a protected class are insufficient to support a Title VII retaliation claim. *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 888 (7th Cir. 2016) (holding that the plaintiff's complaint regarding pay was not protected activity as she did not mention race or discrimination); *Kodl v. Bd. of Educ. Sch. Dist. 45*, 490 F.3d 558, 563

(7th Cir. 2007) ("To constitute protected expression, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of … harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.") (internal quotation marks and citation omitted). Here, although Mr. Turner now asserts that he believes he was denied appropriate, sufficient training because of his race, he has presented no evidence to establish that he ever shared that belief or view with Nice-Pak. Nor can we find that his general complaints about his work environment, unconnected as they were with his race or any mention of discrimination, provided sufficient facts from which Nice-Pak could have or should have inferred that he was complaining about an unlawful employment practice. Accordingly, Mr. Turner's retaliation claim fails for lack of evidence that he engaged in protected activity.

## III.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. Final judgment shall issue accordingly.

IT IS SO ORDERED.


Date:     1/12/2017                                    _Sarah Evans Barker_
                                                       SARAH EVANS BARKER, JUDGE
                                                       United States District Court
                                                       Southern District of Indiana

Distribution:

Paul J. Cummings
HENN HAWORTH CUMMINGS
Paul.Cummings@HHCFirm.com

David M. Henn
HENN LAW FIRM P.C.
david.henn@HHCFirm.com

Melissa K. Taft
JACKSON LEWIS P.C. - Indianapolis
melissa.taft@jacksonlewis.com

Michael W. Padgett
JACKSON LEWIS P.C. - Indianapolis
padgettm@jacksonlewis.com